JEFFREY D. GOOCH (7863)
J. ANGUS EDWARDS (4563)
**JONES WALDO HOLBROOK & MCDONOUGH, P.C.**
170 South Main Street, Suite 1500
Salt Lake City, Utah 84101
Tel.: (801) 521-3200
jgooch@joneswaldo.com
aedwards@joneswaldo.com

*Attorneys for the Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

### CENTRAL DIVISION

| | |
|---|---|
| JAMES SEAVER and DEBORAH SEAVER, as parents and heirs of G.S., deceased,<br><br>        Plaintiffs,<br><br>v.<br><br>The ESTATE of ALEXANDRE CAZES, deceased, a citizen of Canada, formerly doing business as ALPHABAY; THE TOR PROJECT, INC. aka THE ONION ROUTER, a Massachusetts non-profit corporation; CHINA POSTAL EXPRESS & LOGISTICS COMPANY aka CHINA POST aka CHINA COURIER SERVICES CORPORATION, a Chinese corporate or governmental entity; and EMS COOPERATIVE dba EXPRESS MAIL SERVICE, a foreign entity; and THE UNITED STATES POSTAL SERVICE, an agency of the UNITED STATES OF AMERICA,<br><br>        Defendants. | **AMENDED COMPLAINT (JURY DEMANDED)**<br><br>Case No.:2:18-cv-00712-DB-DBP<br><br>Judge: Dee Benson<br><br>Magistrate Judge Dustin B. Pead |

COME NOW the Plaintiffs, by and through Jeffrey D. Gooch and J. Angus Edwards of Jones Waldo, and hereby complain of Defendants and allege as follows:

## I. PARTIES

1. Plaintiffs James and Deborah Seaver are residents of Summit County, Utah, and the parents and heirs of G.S., deceased.

2. Defendant AlphaBay is a foreign business founded in 2014 by a Canadian citizen, Alexandre Cazes, with his principal place of business in Thailand, until Mr. Cazes killed himself during July 2017. Prior to the cessation of operations in July 2017, AlphaBay did business within the State of Utah by selling products through a stream of commerce that ended in Summit County, Utah.

3. Defendant The Tor Project, Inc. aka The Onion Router ("TOR") is a Massachusetts corporation with its principal place of business in Norton, Massachusetts.

4. Defendant China Post Group Corporation (中国邮政集团公司) aka China Post aka China Postal Express & Logistics Company aka China Courier Services Corporation has its principal place of business in Beijing, China, and may be partly or wholly owned by the Chinese government.

5. Defendant EMS Cooperative dba Express Mail Service ("EMS") is a foreign organization providing global delivery services. EMS utilizes a mailing address in Berne, Switzerland.

6. Defendant United States Postal Service ("USPS") is an agency of the executive branch of the United States of America.

## II. JURISDICTION AND VENUE

7. The amount of controversy in this matter exceeds $75,000 exclusive of interest and costs.

8. This Court has original jurisdiction pursuant to 28 U.S.C. §1332(a)(2).

9. All the Defendants have business contracts within the State of Utah, including by and through their distributors, because of sales of their products or their delivery of these products in the State of Utah to be used within the State of Utah.

### III. FACTS COMMON TO ALL CLAIMS FOR RELIEF

10. This action is the result of the death of G.S., a 13 year-old boy, on September 11, 2016.

11. G.S.'s death was caused by ingesting the illicit drug U-47700.

12. Numerous drug labs in China manufacture and sell U-47700 using a patent obtained by the creator of U-47700, Jacob Szmuszkovicz.

13. If U-47700 is manufactured to the exact specifications of its publicly available patent it is purportedly seven and a half times more potent than morphine.

14. From 2014 to July 2017, the AlphaBay website was the largest dark web market selling controlled substances and illicit drugs, including substances and drugs manufactured in China.

15. The AlphaBay website provided anonymity to its users engaged in illicit commerce by being accessible only through The Onion Router ("TOR") network of computers.

16. TOR only transacted business using cryptocurrencies or digital currencies and concealed IP addresses. Cryptocurrencies such as Bitcoin, Monero and Ethereum operate entirely on a decentralized peer-to-peer network, do not exist in a physical form, and are designed to be anonymous. Cryptocurrency payments are recorded on a public ledger that is maintained by peer-to-peer verification, known as the "Blockchain."

17. On information and belief, shortly before G.S.'s death, two of his friends, minor children C.S. and J.A., purchased U-4770 from China using AlphaBay.

18. On information and belief, at the time C.S. and J.A. purchased U-47700, it was not listed as a Schedule I controlled substance by the US Drug Enforcement Administration ("DEA").

19. During late 2016, the DEA listed U-47700 as a Schedule I controlled substance making it illegal to manufacture, purchase, distribute, or possess U-47700.

1480538.3

20. At the time U-47700 was purchased from China by C.S. and J.A., it was, or should have been, a Schedule I controlled substance, since it was many times more potent than morphine and caused numerous deaths during 2016.

21. Chinese producers distribute U-47700 into the United States using the same method as other fentanyl products. The United States Senate has recently investigated the distribution of illicit fentanyl. *U.S. Senate Committee on Homeland Security and Governmental Affairs, Combatting the Opioid Crisis: Exploiting the Vulnerabilities in International Mail.*

22. U-47700 is a chemical pseudonym for a fentanyl product. *Id.* at 31.

23. According to the DEA, China is the primary source of supply for fentanyl and customers can purchase it from Chinese laboratories online (the "Sellers") that are shipped via mail services. *Id.* at 1.

24. The Sellers prefer to be paid through cryptocurrencies such as Bitcoin, which offers a certain level of anonymity. *Id.* at 2.

25. The preferred method of shipment of fentanyl products by the online sellers is EMS, a global delivery service through each member country's postal operations. *Id*.

26. The United States is a member of the 1874 treaty which created the Universal Postal Union. As a member, the United States has designated the USPS as the operator obligated to accept packages from China through the EMS global network. *Id.* at 5. Specifically, when packages are sent by China Post to the United States they pass through an international service center at one of five airports in the United States and are delivered by the USPS. *Id.* at 3–5.

27. After the September 11 terrorist attacks, the Trade Act of 2002 required express consignment operators ("ECOs"), including FedEx and UPS, to collect security information for all packages shipped through their networks. *Id*. at 6.

28. Unlike the ECOs, the USPS relies on foreign postal service operators to collect security information on internationally shipped packages that USPS delivers domestically. *Id*. at 7.

29. Because of the security-information collection requirements for ECOs, all international online sellers of fentanyl prefer to avoid detection of their shipments of fentanyl by shipping their purchases through EMS. *Id*. at 8.

30. Prior to G.S.'s death, China Post, EMS, and USPS knew that Chinese online sellers were shipping fentanyl products to Americans using their services.

31. The shipment services provided by China Post, EMS, and USPS were essential and integral for the online sellers of fentanyl in China to distribute U-47700 in the United States.

32. On information and belief, at 1:46 p.m. on August 26, 2016, the USPS delivered the U-47700 that killed G.S.

33. To avoid detection by law enforcement agencies as international sellers of fentanyl products, the Sellers only sold fentanyl on the dark web by accepting payment in cryptocurrencies and shipped their fentanyl products using EMS.

34. At the time Defendants shipped, marketed, distributed, sold, and/or transported the U-47700 to C.S. and J.A., they knew, or should have known, that minor children were purchasing U-47700.

35. At the time Defendants shipped, marketed, distributed, sold, and/or transported the U-47700 to C.S. and J.A., they knew it was, or should have been, a Schedule I controlled substance.

36. At the time the Defendants shipped, marketed, distributed, sold, and/or transported the U-47700 to C.S. and J.A., they knew it was many times more potent than morphine and had caused numerous deaths during 2016.

37. At the time Defendants shipped, marketed, distributed, sold, and/or transported sold the U-47700 to C.S. and J.A., they knew that U-47700 so unreasonably dangerous that ingestion of almost any amount could cause death.

1480538.3

## ADMINISTRATIVE CLAIM COMPLIANCE

38. On August 16 2018, Plaintiffs sent to the USPS their Notice of Claim and Standard Form 95, as required by 28 U.S.C. § 2675, 39 U.S.C. § 409, and 30 C.F.R. § 912.5.

39. On September 6, 2018, USPS sent a letter to Plaintiffs disclosing that it had received the claim on August 20, the claim was assigned to USPS's National Tort Center, and advising Plaintiffs that USPS had six months to adjudicate the claim.

40. During the six-month adjudication period and up to the present date, the USPS has not sent any additional correspondence to Plaintiffs, nor has it sent notice of final denial of the claim.

## FIRST CAUSE OF ACTION: STRICT LIABILITY

41. Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

42. Defendants were engaged in the business of marketing, distributing, selling, shipping, and transporting U-47700, and did market, distribute, ship, transport and sell U-47700 (also known as "Pink" or "Pinky").

43. U-47700 was placed into the stream of commerce in an unreasonably dangerous condition to the public and the class of persons to which Plaintiffs and G.S. were members.

44. Defendants each had a duty to place safe products into the stream of commerce, including by marketing, distributing, selling, shipping, and transporting U-47700 that was not unreasonably dangerous when put to its intended or designed use and for all foreseeable uses.

45. Defendants knew or expected that the U-47700 that they placed into the stream of commerce by marketing, distributing, selling, shipping, and transporting, was promoted to reach, and did in fact reach, users and consumers in the State of Utah with no change in its condition from the time of design and manufacture through the time the drugs were sold and shipped or transported.

46. At the time U-47700 entered the stream of commerce, it was in an unreasonably dangerous condition. U-47700 was unreasonably dangerous for numerous reasons including, but not limited to, the following:

    a. U-47700 was unreasonably dangerous when used as designed or intended;

    b. U-47700 was designed to be unreasonably dangerous

    c. U-47700 was manufactured to be unreasonably dangerous;

    d. U-47700 was insufficiently tested;

    e. U-47700 was not labeled as an unreasonably dangerous product:

    f. U-47700 was not marketed as an unreasonably dangerous product;

    g. U-47700 was distributed, despite knowledge that it was unreasonably dangerous;

    h. U-47700 was sold, despite knowledge that it was unreasonably dangerous;

    i. U-47700 was shipped and transported, despite knowledge that it was unreasonably dangerous.

47. When U-47700 was used for purposes reasonably foreseeable to Defendants, it posed a high risk of causing death that an ordinary and reasonable person would not expect.

48. Defendants knew or should have known that persons such as Plaintiffs and G.S. who consumed or ingested U-47700 were at high risk of death from even small amounts of the product, but they failed to label or warn such persons of these high risks of death.

49. U-47700 was unreasonably dangerous at the time Defendants placed it into the stream of commerce.

50. U-47700 was expected to and did reach the ultimate user without substantial change in the condition in which it was placed into the stream of commerce.

51. Defendants knew, or reasonably should have known, of the unreasonable danger posed by use and distribution of U-47700.

1480538.3

52. The unreasonably dangerous condition of U-47700 and the failure to provide adequate warnings of its high risk of death were the direct and proximate cause of the death of Plaintiffs' minor son G.S.

53. In addition, the unreasonably dangerous condition of U-47700 was the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifested a knowing and reckless indifference toward, and disregard of, the rights and safety of others, as will be demonstrated by clear and convincing evidence at trial. Accordingly, pursuant to Utah Code Ann., § 78B-8-201, Plaintiffs are entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION: NEGLIGENCE/GROSS NEGLIGENCE

54. Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

55. At all relevant times, Defendants had a duty to place safe products into the stream of commerce, including by marketing, distributing, selling, shipping, and transporting U-47700 that was not unreasonably dangerous when put to its intended or designed use and for all foreseeable uses.

56. Defendants negligently placed U-47700 into the stream of commerce and failed to provide adequate warnings regarding the unreasonable dangers and high risk of death from U-4700, when used as designed or intended, resulting in the death of G.S.

57. Defendants had a duty to every consumer to prevent entry of U-47700 into the stream of commerce, especially to minors like G.S.

58. Defendants knew or had reason to know that Plaintiffs and G.S., as members of the general public, did not know of the high risk of death from U-4700, as described in this Complaint.

59. Defendants failed to exercise reasonable care in placing U-4700 into the stream of commerce and Defendants' negligence and gross negligence were a direct and proximate cause of the death of G.S.

60. In addition, Defendants' conduct manifests a knowing and reckless indifference toward, and disregard of, the rights of others, as will be demonstrated by clear and convincing evidence at trial. Accordingly, pursuant to § 78B-8-201, Plaintiffs are entitled to an award of punitive damages for Defendants' gross negligence.

### THIRD CAUSE OF ACTION: ABNORMALLLY DANGEROUS ACTIVITY

61. Plaintiffs incorporate by reference the preceding allegations as if set forth fully herein.

62. As described in this Complaint, Defendants' actions and activities were abnormally dangerous.

63. Defendants knew that placing U-47700 into the stream of commerce created a high risk of death to G.S. and other minor children.

64. Because Defendants' actions and activities were abnormally dangerous, they are liable for the death of G.S. whether or not they exercised or not they exercised reasonable care.

### FOURTH CAUSE OF ACTION: CIVIL CONSPIRACY

65. Plaintiffs incorporate by reference the preceding allegations as if set forth fully herein.

66. As described in this Complaint, the design, manufacture, distribution, shipping, and transport of the dangerous products at issue in this litigation requires a combination of two or more persons. The Defendants in this action are members of that combination.

67. Defendants share an object to be accomplished: the design, manufacture, distribution, shipping, and transport of U-47700 and other similar products, which enrich the members of the combination.

68. Defendants have had a meeting of the minds on their object or course of action.

69. In seeking to accomplish their shared object, Defendants have committed on or more unlawful, overt acts.

70. Plaintiffs have sustained damages as a direct and proximate result of the unlawful, overt acts committed by Defendants in seeking to accomplish their shared object.

## DAMAGES

71. As a direct and proximate result of the Defendants' acts, activities, and other wrongdoing by the Defendants, Plaintiffs have sustained damages in excess of $10 million, including, but not limited to, the following:

    a. General damages for the wrongful death of G.S. in a reasonable sum;

    b. Any and all wrongful death damages for the death of G.S.;

    c. Survival Damages for G.S.;

    d. Special Damages for G.S.;

    e. The loss of care, comfort, and society of G.S.;

    f. Damages for emotional distress;

    g. Special damages for medical, funeral, cremation, and related expenses incurred, in a reasonable sum;

    h. Other special damages to the extent allowed by law;

    i. Pre- and post-judgment interest, to the extent allowed by law;

    j. Cost, expenses, and attorneys' fees to the extent allowed by law;

    k. Punitive and exemplary damages;

    l. Negative jury instruction based on spoliation of evidence;

    m. Any measurable damages that have resulted from spoliation of evidence; and

    n. Such other and further relief as may be deemed just and proper under the circumstances.

72. The negligence and carelessness of the Defendants was so grossly negligent and culpable in nature that such acts and omissions constituted recklessness and wantonness in complete disregard for the lives and safety of others and, specifically, in complete disregard for the lives and safety of the Plaintiffs and G.S.

1480538.3

73. Defendants recklessly disregarded facts and circumstances, which created an unreasonable risk of harm to the Plaintiffs and G.S., and deliberately proceeded to act in conscious disregard of, or indifference to, the risk, or recklessly proceeded in an unreasonable disregard of or indifference to the risk.

74. As a result of the negligence and gross negligence and reckless, willful, and wanton conduct of the Defendants, the Plaintiffs are entitled to recover exemplary and punitive damages.

75. Punitive damages and exemplary damages are warranted in this action as a punishment of the Defendants for reckless and wanton acts and as a deterrent to the Defendants and others for committing the same or similar actions which endanger the general safety of the public.

76. As a direct and proximate result of the acts and omissions of Defendants as alleged herein including, but not limited to the Defendants' negligence, gross negligence, reckless, willful and wanton conduct, the Plaintiffs are entitled to recover actual, exemplary and punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

77. As a direct and proximate result of the Defendants' acts, activities, and other wrongdoing, G.S. was killed. Accordingly, Plaintiffs, as the parents and statutory Wrongful Death Heirs and Representatives of G.S., were damaged. The Plaintiffs are entitled to recover the following damages in this matter, in excess of $10 million, in amounts to be proven at trial:

    a. Loss of care, protection, companionship, association, advice, and society;

    b. Loss of emotional support and emotional contributions;

    c. Loss of the hedonic value of G.S.'s life;

    d. Punitive or exemplary damages;

    e. For pre-judgment and post-judgment interest;

    f. For costs of suit herein; and

    g. For such further relief as this Court deems just and proper.

COMPLAINT
11
1480538.3

**NOTICE OF RELIANCE ON PRIOR DEMAND FOR TRIAL BY JURY**

Plaintiffs rely on their prior demand that a jury try all of the above issues and allegations.

DATED this 8th day of July, 2019.

                                **JONES WALDO HOLBROOK & McDONOUGH, P.C.**

                                */s/ J. Angus Edwards*
                                Jeffrey D. Gooch
                                J. Angus Edwards
                                Attorneys for Plaintiffs